# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**BRIAN HOFFMAN, individually and on
behalf of all others similarly situated,**

**Plaintiff,**

**-vs-**                                                    Case No.  **6:08-cv-1741-Orl-28DAB**

**AUTHENTEC, INC., F. SCOTT MOODY,
and GARY LARSEN,**

**Defendants.**
_____

## ORDER

This case is a putative securities fraud class action filed under the Securities
Exchange Act of 1934 in which shareholders assert claims against AuthenTec, Inc.
("AuthenTec"), F. Scott Moody ("Moody"), and Gary Larsen ("Larsen") (collectively,
"Defendants").  The case is currently before the Court on Defendants' Motion to Dismiss
(Doc. 75) and Plaintiff's Response (Doc. 76) in opposition.  As more specifically set forth
below, upon consideration of the Corrected Amended Class Action Complaint (Doc. 74)
(hereinafter, the "Amended Complaint"), the submissions of the parties, and oral arguments
by counsel, the Court finds that Plaintiff has not sufficiently pleaded his claims and that
granting leave to amend would be futile.[1]  Accordingly, Defendants' Motion to Dismiss is
granted and the suit dismissed is with prejudice.

_____

[1]In response to the Court's questioning whether any benefit would be gained by
amending the Amended Complaint, counsel for Plaintiff stated, "I can candidly tell you that
I cannot, as I stand here, tell you that I would add any particular thing." (March 20, 2009 Hr'g
Tr., Doc. 71, at 35).

I. Background

A. Introduction

Suing on behalf of himself and a putative class of similarly situated persons and entities who purchased AuthenTec's publicly traded securities between October 29, 2007 and September 5, 2008 ("the Class Period"), Plaintiff filed a two-count Amended Complaint on January 20, 2009.[2] (Doc. 74). In Count I, Plaintiff alleges that all Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. In Count II, Plaintiff avers that Moody and Larsen (collectively, "the Individual Defendants") violated Section 20(a) of the Exchange Act as "controlling persons" of AuthenTec. At all times relevant to this action, Moody was AuthenTec's Chairman of the Board and Chief Executive Officer ("CEO") and Larsen was AuthenTec's Chief Financial Officer ("CFO"). The Defendants have now moved to dismiss the Amended Complaint, arguing that Plaintiff has failed to satisfy the pleading requirements of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA").

B. Facts[3]

---

[2]Brian Hoffman filed the initial class action complaint (Doc. 1) on October 9, 2008 on behalf of himself and other purchasers of AuthenTec securities between April 28, 2008 and September 5, 2008—the class period as originally pleaded. Magistrate Judge David A. Baker appointed Robert L. Caruso ("Caruso") lead plaintiff and granted leave to file an Amended Complaint by January 9, 2009. (Doc. 29). Caruso filed an Amended Class Action Complaint (Doc. 33) on January 9, 2009, and on January 20, 2009, Plaintiff filed the Corrected Amended Class Action Complaint (Doc. 74), correcting a mistake regarding the numbering of the paragraphs contained in the January 9, 2009 Amended Class Action Complaint.

[3]Except as otherwise specifically noted, the facts in this section are taken from the Amended Complaint, SEC filings, and documents referenced in the Amended Complaint that

AuthenTec is a mixed-signal semiconductor company, providing fingerprint authentication sensors and solutions to high-volume personal computer ("PC"), wireless device, and access control markets. (Am. Compl. ¶ 2; AuthenTec's Form 10-Q for Quarterly Period Ending September 28, 2007, Ex. 2 to Doc. 52, at 9). AuthenTec's products incorporate a patented process that detects fingerprint patterns from the live, conductive layer of skin lying beneath the skin's dry outer surface layer. (Ex. 2 to Doc. 52, at 9). Use of the fingerprint sensors enables a customer to access and control multiple functions on an electronic device by touching or sliding a finger across the sensor. (Am. Compl. ¶ 2).

AuthenTec primarily sells its products to original equipment manufacturers ("OEMs"), original design manufacturers ("ODMs"), or contract manufacturers. (Ex. 2 to Doc. 52, at 9). During the Class Period, AuthenTec's focus was on increasing its success in the PC market, a segment of the market that comprised approximately 80% of AuthenTec's sales. (Am. Compl. ¶ 3). Due to eroding profit margins from intense price competition within this industry, expanding AuthenTec's market share was deemed crucial to its ability to remain profitable. (Id. ¶ 6). In order to increase AuthenTec's market share, Defendants intended to increase sales in two manners: (1) by achieving greater "attach" levels, meaning that existing customers would incorporate the sensors into a larger number of products, and (2) by broadening its customer base to include new manufacturers and models. (Id.). However,

have been filed by the parties. See Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1278 (11th Cir. 1999) (holding that when considering a motion to dismiss in a securities fraud case, a court may take judicial notice of documents filed with the SEC for the purpose of determining what statements the documents contain). The facts taken from the Amended Complaint are assumed to be true for the purpose of deciding this motion under Federal Rule of Civil Procedure 12(b)(6).

acquiring new customers is a time-consuming, expensive, and labor-intensive process involving extensive back-and-forth interactions between AuthenTec's engineers and a new customer's design team before a customer would incorporate AuthenTec's sensors into the design of a PC, handset, or access product. (Id. ¶¶ 5, 17). This decision to incorporate AuthenTec's sensor into a customer's end product is called a "design win," and once a design win is achieved, the sensor is "likely" to remain designed into the product for the remainder of that product's life cycle.[4] (Id. ¶ 5).

On October 29, 2007, AuthenTec issued a press release in which Moody stated, "We continue to secure significant design wins for enterprise and consumer laptops with the world's largest PC OEMs. We are also experiencing increased design-in activity of our sensors in PC desktops and peripherals, as well as expanding opportunities in the wireless market, particularly in Asia." (Id. ¶ 39; October 29, 2007 Press Release, Ex. 1 to Doc. 52,

_____

[4]In the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of AuthenTec's Form 10-Q for Quarterly Period Ending September 28, 2007 (Ex. 2 to Doc. 52), AuthenTec described its sales process as follows:

> Our customers' products are complex and require significant time to define, design and ramp to volume production. Our sales cycle begins with our marketing and sales staff and application engineers engaging with our customers' system designers and management, which is typically a multi-month, or even multi-year, process. If we are successful, a customer will decide to incorporate our solution in its product, which we refer to as a design-win. Because the sales cycles for our products are long, we incur expenses to develop and sell our products, regardless of whether we achieve the design-win and well in advance of generating revenue, if any, from those expenditures. We do not have long-term purchase commitments from any of our customers, as sales of our products are generally made under individual purchase orders. However, once one of our products is incorporated into a customer's design, it is likely to remain designed in for the life cycle of its products.

(Id. at 15).

at 1).  Moody also stated that "[i]n order to continue this momentum[,] we plan to accelerate our investments in R&D during the fourth quarter to support several new product developments and other initiatives."  (Am. Compl. ¶ 39; October 29, 2007 Press Release at 1).  During a conference call held later that same day, Moody provided additional details regarding design wins and new product development.  Specifically, Moody discussed the planned introduction in the first quarter of 2008 of AuthenTec's advanced security project codenamed "Borah,"[5] reporting that "[t]he development activity around [Borah] continues to progress and now is design[ed] in by three top tier OEM accounts.  The first [PC]s with [Borah] should start to appear in the second quarter of 2008, driving material revenue in the second half of the year."  (Am. Compl. ¶ 40; Ex. 3 to Doc. 52, at 7).

On February 4, 2008, AuthenTec issued a press release, quoting Moody as stating that "we are even more excited about our future prospects since we believe we are still in the beginning stages of a billion unit per year market opportunity" and "[t]o capitalize on this opportunity, we have continued to aggressively invest in new and exciting products and technologies.  In fact, during the first quarter we will introduce the [Borah sensor], the first single chip match-on solution for the PC market."  (Am. Compl. ¶ 46; Feb. 4, 2008 Press Release, Ex. 4 to Doc. 52, at 2-3).  In the "Business Outlook" section of the press release, Moody opined that he expected revenue growth to be driven by new product introductions and "a robust pipeline of design wins" and explained that AuthenTec expected revenues to

---

[5]"Borah"—spelled as "bora" in the conference call transcript but spelled "Borah" in subsequent company documents and by the parties—is actually AuthenTec's model AES2810 sensor.

"range between $72 million and $78 million, up from $52.3 million in the previous year." (Am. Compl. ¶ 46; Feb. 4, 2008 Press Release at 3). In a conference call held on the same day, Moody declared that AuthenTec was on schedule with its introduction of the Borah sensor into the PC market and that it had already been "designed in by three key accounts with limited production volumes in Q1 and Q2 before ramping in Q3." (Am. Compl. ¶ 47; Feb. 4, 2008 Conference Call, Ex. 15 to Doc. 52, at 5). Moody further stated that he expected sales of the Borah sensor to drive revenues from the PC market in the second half of 2008. (Am. Compl. ¶ 47; Feb. 4, 2008 Conference Call at 5). Addressing the financials, Larsen noted that an "increase in operating expenses versus the prior year is primarily due to the growth in our business, including new product development to support design wins going into production in 2008." (Am. Compl. ¶ 47; Feb. 4, 2008 Conference Call at 7).

On February 25, 2008, AuthenTec issued a press release touting its introduction of the Borah sensor, the AES2810, described as "the world's most secure fingerprint sensor available for the PC market." (Am. Compl. ¶ 51). The press release further stated that the AES2810 is "[a]lready designed into dozens of new notebook models from the world's leading PC manufacturers" and that "the AES2810 will begin sampling this quarter, with volume production expected in the second quarter." (Id.). AuthenTec also filed its Form 10-K Annual Report with the SEC on February 29, 2008. (Id. ¶ 53; 2008 Annual Report, Ex. 6 to Doc. 52). In the Annual Report, AuthenTec identified its strong relationship with the world's leading PC and wireless device manufacturers as one of its competitive strengths. Specifically, the Annual Report related that AuthenTec had "developed long-standing collaborative relationships with leading customers worldwide. These strong relationships

enable us to work with our customers and tailor our solutions to fit into their research and development efforts." (Am. Compl. ¶ 53; 2008 Annual Report at 10).

On April 28, 2008, AuthenTec issued a press release announcing that the company had achieved revenue growth of 67% in the first quarter of 2008 as compared to the first quarter of 2007. (Am. Compl. ¶ 57; Apr. 28, 2008 Press Release, Ex. 7 to Doc. 52, at 1). AuthenTec announced earned revenues of $15.5 million, beating the company's prior guidance of expected revenues of between $15.0 and $15.3 million. (Am. Compl. ¶ 57; Apr. 28, 2008 Press Release at 1). The press release also stated that "the Company incurred additional expenses primarily associated with investments made to further its future growth, in particular R&D associated with new product developments and the acquisition of the EzValidation software assets." (Apr. 28, 2008 Press Release at 1). Under the "Business Update" section, the press release informed its readers that "AuthenTec achieved several key product and technology development milestones during the quarter, including the launch of new products for the PC and wireless markets. For the PC market, AuthenTec introduced the world's most secure fingerprint sensor, the AES2810 single chip, match-on solution." (Id. at 2). Moody claimed in this same section that "we added PC and cell phone design wins with new customers and increased our attach rates with existing customers, resulting in new product programs and opportunities for continued sales growth throughout 2008." (Id.). In the "Financial Outlook" section, Moody stated:

> For the remainder of 2008, we expect our strong growth to continue, supported by new product introductions and a robust pipeline of design wins, which will drive increased revenues on a year-over-year basis . . . . For the second quarter of 2008, we expect revenue to range between $17.2 million to $17.8 million. In order to continue our momentum, we plan to accelerate our

investments in R&D during the second quarter to support several new product developments and other initiatives. Accordingly, we expect the second quarter non-GAAP earnings per share to range between $0.02 per diluted share to $0.03 per diluted share, compared to a loss of $0.03 per diluted share in the second quarter of 2007.

(Id.).

Moody and Larsen held a conference call with analysts shortly after the April 28, 2008 press release to discuss AuthenTec's first quarter results. (Am. Compl. ¶ 58; Apr. 28, 2008 Conference Call, Ex. 8 to Doc. 52). In discussing EzValidation software, Moody informed the analysts that AuthenTec had begun integrating EzPassport features into AuthenTec's applications, with plans to begin demonstrating these features to PC customers sometime during the third quarter. (Am. Compl. ¶ 58; Apr. 28, 2008 Conference Call at 4). Moody then stated that the AES2810 sensor "establishes a new benchmark for security" and "will be introduced in both commercial and consumer products by three of the top five PC OEMs during the second quarter." (Apr. 28, 2008 Conference Call at 4). Additionally, Moody highlighted AuthenTec's first quarter performance, noting that the company achieved strong growth in the PC market in the first quarter despite this being a traditionally slow period for PC manufacturers and that AuthenTec's sensors "are now integrated into consumer and enterprise notebooks from eight of the nine leading notebook manufacturers." (Am. Compl. ¶ 58; Apr. 28, 2008 Conference Call at 5).

At this point, Moody turned the call over to Larsen to discuss the financial results for the quarter. Addressing a rise in operating expenses, Larsen disclosed that a recent increase in expenses "primarily reflects higher R&D spending to support product development initiatives, as well as a $250,000 R&D charge related to the EzValidation

transaction." (Am. Compl. ¶ 58; Apr. 28, 2008 Conference Call at 7). Larsen then attempted to give guidance for the remainder of the year and advised that "we expect our strong growth to continue for the remainder of 2008, driven by new product introductions and a robust pipeline of design wins. For the second quarter of 2008, we anticipate revenue to be in the range of [$]17.2 million to $17.8 million, driven by the start-up of volume shipments of the AES2810 into the PC market." (Am. Compl. ¶ 58; Apr. 28, 2008 Conference Call at 7).

After concluding their opening statements, Moody and Larsen began a question-and-answer session with the analysts regarding AuthenTec's recent quarter. Moody reaffirmed that the company expected annual revenues between $72 million and $78 million for the 2008 year and stated that the top five customers represented approximately 79% of revenues in the first quarter, down from 85% in 2007, adding that "we are starting to see some of our concentration dissipate."[6] (Am. Compl. ¶ 58; Apr. 28, 2008 Conference Call at 15). Responding to a question seeking a breakdown of forecasted growth, Moody stated:

> [A] good part of our growth in the second quarter will be driven by two material new accounts for us, one particularly in Q2, another one a little bit more in Q3 and Q4. As we mentioned earlier, the 2810 has three major design-ins right now. Three of the top five PC OEMs have designed it in. One of those is an existing account; two of those are, in essence, new accounts. In terms of the ramp over this quarter, a good bit of that is directly associated with the 2810.

(Am. Compl. ¶ 58; Apr. 28, 2008 Conference Call at 8). Addressing a question regarding whether a forecasted strong second quarter performance was a result of "pull-ins"—selling

---

[6]In the Amended Complaint, Plaintiff attributes these statements to Larsen. (Am. Compl. ¶ 58). According to the transcript of the conference call, however, Moody actually made the comments regarding the percentages of revenues generated from the top five customers. (Apr. 28, 2008 Conference Call at 15).

additional product in one quarter at the expense of future sales—from the second half of the year, Moody opined:

> I don't necessarily think it's pulling from the third quarter, just looking at it a slightly different way. What I do see is just an increase as customers are—I think their forecasts, frankly, were a little bit light, particularly on the 2810, and we're seeing that. But I don't necessarily think it's a pull-in. Whatever kind of numbers that were out there for Q3 and Q4 probably—and to be honest, I don't remember what those are right off the top of my head—but are probably still right. The growth numbers might not be the same, by definition, because Q2 is going to be much higher than a number of analysts had in their models to start with. I think a lot of them—a lot of folks had something in the mid 15s, say, 15.5. So now we're looking at the midpoint of 17.5, and then of course Q3 and Q4. So—but I don't think it's a pull-in . . . [from] Q3 at all.

(Am. Compl. ¶ 58; Apr. 28, 2008 Conference Call at 12-13). Later in the conference call, an analyst questioned whether the upward revision of forecasted second quarter revenues was a result of earlier than expected volume shipping of the AES2810 sensor. Moody responded:

> Yes. It's shipping a little earlier than at least our customers were forecasting at some point. Luckily, . . . we at times thought those forecasts were a little bit low. So, we did make some investments in inventory, so we'll be able to meet all of our customer requirements. But definitely a good part of that uptick is associated with, if you will, increased forecasts for the 2810.

(Am. Compl. ¶ 58; Apr. 28, 2008 Conference Call at 15). Moody also addressed the economic climate and whether outlooks on sales were conservative during the prior conference call after the fourth quarter, stating:

> First off, we're really not seeing too much of an impact of, if you will, what you read in the paper or see on the news every night. At least we're not seeing it. We tried to go into the year with some conservatism ourselves. And the bottom-line, really, is that again, while we shipped a lot of units in the last—some 4 million units last quarter, it's still a very small part of the total available market out there. So we're really not impacted too much by overall demand for total laptops, if you will, or total cellphones. So we're not as

seasonal, maybe, or as impacted by, let's say, a recession, by some others that may be on all PCs or all cellphones.  So, our customers seem to be and continue to be positive about the market.

(Am. Compl. ¶ 58; Apr. 28, 2008 Conference Call at 16).

On July 28, 2008, AuthenTec issued a press release announcing its second quarter financial results.  (Am. Compl. ¶ 63; July 28, 2008 Press Release, Ex. 10 to Doc. 52).  In this press release, AuthenTec announced that its second quarter revenues were $18.4 million, exceeding its previous guidance of between $17.2 to $17.8 million.  (Am. Compl. ¶ 63; July 28, 2008 Press Release at 2).  The "Business Update" section credited the AES2810 as helping to drive growth and explained that "the ramp-up of this new highly secure sensor will continue throughout the second half of 2008."  (Am. Compl. ¶ 63; July 28, 2008 Press Release at 3).  Moody stated that "revenue growth was driven by expanding fingerprint sensor attach rates with existing customers and a diversification of our customer base." (Am. Compl. ¶ 63; July 28, 2008 Press Release at 3).  In the "Financial Outlook" section, Moody related that "[f]or the remainder of 2008, we expect our strong growth to continue, supported by new product introductions and a robust pipeline of design wins, which will drive increased revenues on a year-over-year basis."  (Am. Compl. ¶ 63; July 28, 2008 Press Release at 3).  Additionally, Moody opined that the company expected third quarter revenues "to range between $19.0 to $20.0 million" and revenues for the 2008 full year to "range between $72 million to $78 million."  (Am. Compl. ¶ 63; July 28, 2008 Press Release at 3).

As per their usual practice, Moody and Larsen held a conference call later that day to discuss the company's recent performance and address a wide range of topics related to AuthenTec's business.  In addition to information contained in the July 28, 2008 Press

Release, Moody revealed that HP, Dell, and Lenovo were the three OEMs with whom AuthenTec had previously achieved design wins after these customers had unveiled their PC products incorporating the AES2810 sensor. (Am. Compl. ¶ 64; July 28, 2008 Conference Call, Ex. 11 to Doc. 52, at 5).

Larsen then reaffirmed the second quarter revenue numbers and stated that "revenue growth primarily reflects growth in the PC segment of our business driven by increasing attach rates and the initial ramp of the AES2810." (Am. Compl. ¶ 64; July 28, 2008 Conference Call at 6-7). Larsen explained that though operating expenses as a percentage of revenues had decreased, total operating expenses increased primarily because of "investments to further our growth, including R&D associated with new product development activities to support the AES2810 introduction." (Am. Compl. ¶ 64; July 28, 2008 Conference Call at 7). Larsen also detailed an increase in inventory of $2.9 million due to "build up of inventory to support our customer's ramp-up for the third quarter of this year." (Am. Compl. ¶ 64; July 28, 2008 Conference Call at 7). In closing the first portion of the conference call, Larsen repeated the revenue guidance contained in the press release, reiterating an expected range of between $19 million and $20 million for the third quarter and a range of between $72 million and $78 million for the full year. (Am. Compl. ¶ 64; July 28, 2008 Conference Call at 8). Larsen specifically stated that "[w]ith regard to guidance, notwithstanding the macroeconomic weakness that is impacting a number of other technology companies, we expect our strong revenue growth to continue, supported by new product introductions and a robust pipeline of design wins, which will drive increased revenues on a year-over-year basis." (July 28, 2008 Conference Call at 6-7).

After these statements, Moody and Larsen opened the conference call to questions from analysts. The first questioner congratulated the company on its performance in the second quarter and asked whether the second quarter revenues were "pulled forward" from the third quarter or from products ramping up faster than expected. (Am. Compl. ¶ 64; July 28, 2008 Conference Call at 8). Moody responded that "it's actually a little bit hard to judge where it's necessarily pulled from, but we certainly were pleased with the quarter. We did see a reasonably significant ramp on the 2810. . . . [W]e do expect an uptick to continue in our third quarter in our revenues." (Am. Compl. ¶ 64; July 28, 2008 Conference Call at 8). Additionally, Moody stated that "our objective in the end of the day is to satisfy our customers; they wanted the product in Q2 and we shipped it." (Am. Compl. ¶ 64; July 28, 2008 Conference Call at 8). After being asked if the company was being "a little bit cautious in Q3 revenue guidance," Moody answered:

> Well, I'll tell you right now, I mean, every day you open the paper or drive by a gas station, you read another horror story or you see it on the sign. So I think a lot of people are very leery about the overall economy. I think the important part for us is that we are executing and doing what we said. We mentioned HP, of course, with the 2810; Dell coming on as a new customer, and Lenovo ThinkPad, as well. So we're getting the design-ins. We're seeing a lot of interest again—jokingly, not to be confused with demand, but I wouldn't be mentioning it unless we thought it was material. We're continuing to see a lot of interest and growing interest in the cell phone. So, . . . frankly there's only so much I can do about the overall economy. We went into the year relatively, I would say, pessimistic about the overall economy, and I'm pleased that we've been able to attain or retain the guidance we provided earlier on. So, as long as we continue to execute, gain share, start penetrating that wireless market, smarter people than us can estimate what the overall economy and the market will do.

(Am. Compl. ¶ 64; July 28, 2008 Conference Call at 8-9).

Addressing analysts' questions regarding the AES2810 sensor, Moody attributed the

product's success to its secure "one-chip" process of matching fingerprints as opposed to the competition's two-chip process. (Am. Compl. ¶ 64; July 28, 2008 Conference Call at 9-10). Moody then applauded the operations team for its "excellent job" introducing the AES2810 and for quickly ramping up the product while maintaining strong yields and efficiencies. (Am. Compl. ¶ 64; July 28, 2008 Conference Call at 10). Discussing the trend of AuthenTec's average selling price ("ASP") per product, Moody stated that "our ASP this quarter was about $3.50. So that's about 12% down from the prior year" and later added that "we do *expect* . . . [ASPs] to increase as the 2810 gets fully rolled out. So we'll actually see a sequential increase in ASP." (Am. Compl. ¶ 64; July 28, 2008 Conference Call at 14) (emphasis added). Finally, Moody answered a question regarding whether any customers represented 10% of revenues in the quarter, stating that "we don't specifically get into that on a quarterly basis. I guess what I would communicate, though is [that] the top five customers in Q2 were about 70% of our revenue . . . down from about 87% in Q2 of last year. . . . showing me that we have been diversifying our customer base." (Am. Compl. ¶ 64; July 28, 2008 Conference Call at 15).

On September 7, 2008, AuthenTec issued a press release updating its business outlook. (Am. Compl. ¶ 67; September 7, 2008 Press Release, Ex. 14 to Doc. 52). In this press release, AuthenTec revised its guidance downward from its previous guidance of $19 million to $20 million for the third quarter and $72 million to $78 million for the full year. "Based on order trends and discussions with customers, AuthenTec now expects third quarter revenue to range between $18.2 million and $18.5 million and fiscal year 2008 revenue to range between $69 million and $71 million." (Am. Compl. ¶ 67; September 7,

2008 Press Release at 2). AuthenTec attributed the reduced revenue expectations to "an overstocked inventory position at a new customer and the impact of lower than expected sales of higher end notebooks, which are more likely to be equipped with a fingerprint sensor as a standard or optional feature." (Am. Compl. ¶ 67; September 7, 2008 Press Release at 2). Additionally, AuthenTec revealed that it had lost a 2009 design in opportunity with "a significant PC customer"—later revealed to be HP. (Am. Compl. ¶ 67; September 7, 2008 Press Release at 2). The press release stated that the customer "does not presently plan to use AuthenTec's fingerprint sensors in its next design cycle in late 2009" and that this would begin to impact sales in the second quarter of 2009. (Am. Compl. ¶ 67; September 7, 2008 Press Release at 2). This customer represented 40% of AuthenTec's second quarter 2008 revenues and approximately 30% to 35% of third quarter 2008 revenues. (Am. Compl. ¶ 67; September 7, 2008 Press Release at 2). However, despite losing the 2009 design-in opportunity, AuthenTec remained a supplier to HP and planned to continue competing for future opportunities with HP. (Am. Compl. ¶ 67; September 7, 2008 Press Release at 2).

Prior to the opening of financial markets the following day, Moody and Larsen held a conference call to discuss the updated revenue estimates with analysts. (Am. Compl. ¶ 68). After Larsen restated the revised revenue guidance and loss of a design-in opportunity contained in the previous day's press release, Moody provided additional detail. (Id.). Regarding the revised revenue forecast, Moody stated:

> We have recently experienced a number of order cancellations and changes affecting our third quarter, as well as a reduction in the forecast from our customers that is impacting our revenue expectations for 2008. . . . On

previous calls I've expressed concerns with the overall economy and its potential impact on our markets, even though it did not seem to be affecting us to any material level. In fact during the Q&A session as part of the last earnings call, I believe a caller even commented that we seemed to be immune from the economic situation. As it turns out, the effect of the downturn that has impacted many others in the semiconductor industry seems to have been masked to us by the fact that one of our newer customers overbought in the second quarter. This has led to an overstocking position on their part and this reduced forecasts for the remainder of the year. We are still working to fully understand the impact and the size of the inventory build, but at this point we are assuming that it will take at least a quarter for them to work through this inventory.

(Id.).

Moody also spoke to the lost design-in opportunity for the 2009 models of "a significant customer," adding that "we are not complete in our assessment of the impact" of the lost opportunity and that "we continue to have a very good relationship with this customer." (Id.). "For competitive reasons and confidentiality obligations," Moody refused to go into detail as to why this customer decided to not use AuthenTec's product in its 2009 models. (Id.). However, Moody asserted, "[W]e believe we understand the reasons and are taking immediate action to remedy these issues. This remains an important customer to us and we believe we have every opportunity to continue to be a valued supplier to them." (Id.). After the markets opened on September 8, 2008, AuthenTec's shares declined $3.84 per share, a 60.1% drop from the prior close. (Id. ¶ 69).

C. Plaintiff's Allegations

In the Amended Complaint, Plaintiff identifies numerous statements that he alleges to be materially false or misleading. For the sake of clarity, these allegations are addressed chronologically.

<u>1. October 29, 2007 Press Release & Conference Call</u>

Plaintiff alleges that Moody's October 29, 2007 statement that the AES2810 "is design[ed] in by three top tier OEM accounts" was materially false when made because Lenovo—presumably, the third OEM at issue—was not "locked in" as a customer until December 2007 at the earliest. (Am. Compl. ¶ 43(a)). For support, Plaintiff provides internal company emails purportedly showing that Moody prematurely announced that the AES2810 sensor was designed into the Lenovo ThinkPad before such a design in was actually secured. (<u>Id.</u> ¶ 44(b). In a November 28, 2007 email from David Smith ("Smith"), the Director for Software Engineering, Smith reminded the design team that "[w]e have one major milestone left to hit on Dec. 3rd and Lenovo will be locked in with AuthenTec!" (<u>Id.</u>). A December 4, 2007 email from Curt Chandler to Moody and other unidentified persons states that "[w]e are so close to getting a 'Go' [from Lenovo] . . . the final Go NoGo decision will happen [in] Japan Thursday." (<u>Id.</u> ¶ 44(c) (first alteration in Am. Compl.)).

Additionally, Plaintiff alleges that Defendants "[m]isled investors to believe that once AuthenTec won the business of the three top-tier OEMs, by having that customer 'design in' its products, that these customers would likely remain with AuthenTec for the duration of that product." (<u>Id.</u> ¶ 43(c)). In the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section of AuthenTec's Form 10-Q for Quarterly Period Ending September 28, 2007, AuthenTec stated that "once one of our products is incorporated into a customer's design, it is likely to remain designed in for the life cycle of its products." (Ex. 2 to Doc. 52). Plaintiff also argues that Defendants "[m]isled investors concerning the R&D expense" by not informing investors that the expenses were for work outsourced to

troubleshoot problems occurring with the Borah software. (Am. Compl. ¶ 43(d)). According to a confidential witness ("CW1"), these problems occurred because "Lenovo was promised functionality under otherwise impossible to meet deadlines." (Id.).

Plaintiff also claims that Defendants failed to disclose material information. Allegedly, the statements contained in the October 29, 2007 press release and conference call were materially false and misleading because Defendants "failed to disclose numerous problems with Borah's software, which was just starting the process of being tested and debugged for all three OEMs—a process which continued right through the launch date in February and thereafter." (Id. ¶ 43(b)). Additionally, Plaintiff avers that Defendants failed to disclose that Lenovo had threatened, and continued to threaten, to take its business to AuthenTec's competitor, Upek, because of AuthenTec's inability to provide timely and effective fixes for various software problems. (Id. ¶ 43(e)). Plaintiff bases these allegations in part on internal company emails from November 2007 detailing errors in testing the Borah sensor with the Lenovo ThinkPad. (Id. ¶ 44(a)(i)-(iii)). Additionally, Plaintiff relies on an email from Smith in which he states that Lenovo was "concerned with the number of outstanding issues that remain open." (Id. ¶ 44(b)). Additionally, CW1 informed Plaintiff that AuthenTec's management was aware of the "roadblocks" and the "serious and continuous problems which prevented AuthenTec's customers from obtaining a functional product."[7] (Id. ¶ 18).

2.  February 4, 2008 Press Release and Conference Call

---

[7]Plaintiff later admits that CW1, on whom Plaintiff hinges the majority of his claims regarding AuthenTec's difficulty in developing the AES2810 sensor and the resulting customer dissatisfaction, committed perjury in a hearing pertaining to this case. (See Mar. 2, 2009 Hr'g Tr., Doc. 64, at 181).

Plaintiff identifies several statements from February 4, 2008 that were allegedly materially false or misleading. Plaintiff alleges that because of continuing technical problems with the AES2810 sensor and its accompanying software, the following statements were either materially false or misleading: (1) Moody's statement in the press release regarding AuthenTec's ability to capitalize on the expected "billion unit per year market opportunity"; (2) Moody's statement in the conference call that sales of the AES2810 sensor would drive revenue growth in the second half of 2008; (3) the company's statement that it "expects revenue to range between $72 million and $78 million" for fiscal year 2008; (4) Moody's statement that AuthenTec was on schedule to introduce the AES2810 and that it was designed into three key accounts; and (5) Larsen's statement during the conference call that increased research and development was supporting design wins going into full production. (Id. ¶ 48). Plaintiff claims that these statements were materially false and misleading because Defendants "knew but concealed facts which contradicted the public image that the AES2810 would make a timely debut in accordance with the requirements of the top-tier OEM customers—thereby driving revenues." (Id.)

For support, Plaintiff relies upon internal company emails from December 2007 to show that the AES2810 was "riddled with bugs and other software and driver problems" in early February 2008. (See id. ¶ 48(a)(i)-(iii)). Plaintiff also relies on statements from CW1 and another confidential witness ("CW2") that AES2810 customers complained about not receiving the sensor or software that they ordered or that the product was not working properly. (Id. ¶ 48(b)). CW1 indicated that management wanted to "keep Lenovo happy" and would outsource work to troubleshoot problems in order to deliver the new product on

schedule. (Id. ¶ 48(c)). CW1 stated that management directed him to deliver software even if it was not ready or was not what the customer ordered. (Id.). The Amended Complaint alleges that while AuthenTec took measures to keep Lenovo happy, it did not treat HP in the same manner and began missing deadlines with HP. (Id.). CW2 claims that at the end of his workday, he would report unresolved problems to upper management; however, despite these problems being unresolved, CW2 would be presented with different problems the next day.[8] (Id. ¶ 48(d)). The Amended Complaint asserts that both CW1 and CW2 claim that AuthenTec sent software to customers despite this software not meeting the customers' specifications. (Id.).

### 3. February 25, 2008 Press Release

Plaintiff alleges that the February 25, 2008 press release contained a materially false and misleading statement because it indicated that the AES2810 was "[a]lready designed into dozens of new notebook models from the world's leading PC manufacturers" and that "the AES2810 will begin sampling this quarter, with volume production expected in the second quarter." (Id. ¶ 52). Plaintiff asserts that this statement is false and misleading for two reasons: (1) because "sensors shipped separately from software. Thus, even though software problems existed, that a sensor is 'already designed in' should not necessarily imply functionality," (id. ¶ 52(a)); and (2) because the "complex software required customization

---

[8]The Amended Complaint does not state that these problems were not addressed, just that CW2 was not presented with the same problems the next day. Simply because CW2 was provided with a different task the next day does not imply that management ignored the problem. The Court notes that it is equally feasible that the problem was solved by another engineer or that management felt that CW2 was unable to fix the problem.

for each customer, something that [AuthenTec] struggled throughout 2007 and 2008 to provide," (id. ¶ 52(b)).  As proof that AuthenTec would be unable to begin sampling in the second quarter and begin shipping in quantity during the second half of the year, Plaintiff quotes an email[9] in which Vince Alvarez directed an unidentified recipient to "focus on regressing all the Thinkpad bugs off the branch.  If there are bugs that you find . . . make sure it is unique to the Lenovo Thinkpad."  (Id.).

### 4.  February 29, 2008 Form 10-K

Plaintiff contends that Defendants issued a materially false or misleading statement by touting their strong relationships with leading global PC and wireless manufacturers as a competitive strength.  (Id. ¶¶ 53, 55).  Specifically, Plaintiff takes issue with the statement in the 10-K that "[w]e have developed long-standing collaborative relationships with leading customers worldwide.  These strong relationships enable us to work with our customers and tailor our solutions to fit into their research and development efforts."

Plaintiff claims that this statement is false or misleading for two reasons.  First, Plaintiff alleges that AuthenTec allowed its relationship with HP—a customer reportedly providing over 30% of revenues in 2007—to sour.  According to the Amended Complaint, AuthenTec focused its attention on customizing the AES2810 software for Lenovo in an

---

[9]In the Amended Complaint, Plaintiff alleges that this email was sent on February 14, 2008.  However, defendants dispute this date in their motion to dismiss and claim that the email was sent on February 4, 2008.  (Doc. 75 at 17 n.10).  Plaintiff later concedes the point but maintains his argument that continuing problems coupled with the proximity in time to the AES2810's announced launch give credence to Plaintiff's claim that AuthenTec would be unable to begin volume shipping of the new sensor.  (Doc. 76 at 9 n.7).  However, it is undisputed that AuthenTec did actually begin shipping the new sensor in the second quarter.

attempt to secure its business, causing AuthenTec to neglect its relationship with HP. (Id. 55(a)). Second, Plaintiff believes that the statement was false or misleading because "by the time the Form 10-K was filed, although AuthenTec had a dominant position in the wireless market, it felt competitor Atrua breathing down its neck."[10] (Id. ¶ 55(b)).

### 5. April 28, 2008 Press Release and Conference Call

Plaintiff argues that Defendants made several materially false or misleading statements during the April 28, 2008 press release and conference call. (Id. ¶ 59). Without identifying a specific statement, Plaintiff argues that "statements with respect to the operating expenses *give the impression* that well-planned R&D expenses were keeping AuthenTec at the cutting edge of new product design." (Id. ¶ 59(a)) (emphasis added). Plaintiff claims that this is a false or misleading statement because AuthenTec's "acquisition of EzValidation was long overdue, as the [prior] discussion of [AuthenTec's] host of software issues suggests." (Id.). Additionally, Plaintiff reiterates his prior allegation that AuthenTec's categorization of fees paid to outside contractors as an R&D expense was improper and misleading. (Id.).

Plaintiff also takes issue with Defendants' characterization of the AES2810 as the "most secure" fingerprint sensor, presumably—though not specifically stated as such—based on the statement contained in the press release that AuthenTec had introduced "the world's most secure fingerprint sensor, the AES2810 single chip, match-on solution." (Id. ¶ 59(b)). Plaintiff argues that this is false or misleading based upon CW2's statements regarding persistent problems with the AES2810, notably a low detection rate (the sensor would

---

[10]Atrua had recently achieved a design win with Toshiba, purportedly "snatching" Toshiba from AuthenTec. (Am. Compl. ¶ 55(b)).

reportedly work during one out of five attempts) and multiple recognition (the sensor would recognize multiple people as having the same fingerprint).[11] (Id. ¶¶ 48(e), 59(b)).  Plaintiff also alleges that the "statements suggesting that new attaches and new PC wins would diversify AuthenTec's customer base misled customers because not only were new customers in jeopardy, such as Dell and Lenovo, but defendants' decision to treat HP—traditionally one of AuthenTec's largest investors—shabbily to curry favor with Lenovo would have a far more devastating effect."[12] (Id. ¶ 59(d)).

Plaintiff further claims that Defendants made false and misleading statements regarding the AES2810 sensor's ability to drive revenue growth, the company's revenue guidance, and whether the company's strong second quarter results were a result of "pull ins." (Id. ¶ 59(c)).  Plaintiff claims that the statements were false and misleading because of "severe software problems and an inability to resolve them to the satisfaction of Lenovo and HP plac[ing] future purchase orders in jeopardy."[13]  Additionally, Plaintiff apparently argues that Defendants' revenue guidance numbers were false and misleading in another manner.  Plaintiff asserts that in light of continuing software customization needed by the

---

[11]Notably, Plaintiff does not provide a timeframe for when CW2 alleged that these "persistent problems" occurred.  Nor does Plaintiff provide any evidence that the problems identified by CW2 remained unresolved at the time of the product's launch or that a more secure fingerprint sensor existed.

[12]The Court assumes that Plaintiff meant to claim that these statements misled investors, not customers of AuthenTec and that HP was traditionally one of AuthenTec's largest customers, not investors.

[13]Plaintiff, however, does not identify any software problems other than those previously discussed as occurring prior to the AES2810's launch.

individual customers, Defendants "may have" recognized revenue derived from sales of the AES2810 prematurely because AuthenTec recognized this revenue when the product was shipped, not when the software was "dropped" for the customer to download.[14]  (Id. ¶ 59(e)).

### 6.  July 28, 2008 Press Release and Conference Call

Plaintiff argues that Defendants made numerous materially false or misleading statements during the July 28, 2008 press release and conference call, often simply restating identical reasons as those raised previously with regard to other press releases and conference calls.  (Id. ¶ 65).  First, Plaintiff asserts that Defendants' statement that the increase in operating expenses was partly attributable to "R&D associated with new product development activities to support the AES2810 introduction" was false or materially misleading because these expenses were really "continued expenses . . . to hire outside contractors to troubleshoot problems with the product."[15]  (Id. ¶ 65(a)).  Additionally, Plaintiff again asserts that the statements that the AES2810 was the most secure fingerprint sensor and that it would continue to drive revenues for the year were false or misleading.  (Id. ¶¶ 65(b)-(c)).  Plaintiff also realleges that Defendants' statements regarding diversification via new attaches and new PC wins were false or misleading because AuthenTec was in danger of losing customers—both new and old—because of the decision to focus on Lenovo.  (Id.

---

[14]The software used to run the sensors would be "dropped" or posted to a website for the customer to download.

[15]The Court assumes that this is the statement regarding R&D expenses that the Plaintiff refers to.  The Court is forced to assume as much because Plaintiff does not identify the exact statement he finds misleading.  Instead, Plaintiff refers to a prior paragraph spanning seven pages that contains excerpts of the July 28, 2008 conference call transcript.  (Am. Compl. ¶¶ 64-65).

¶ 65(d)).  For support of the misleading nature of these statements, Plaintiff offers CW1's statement that HP personnel visited AuthenTec's corporate headquarters in June 2008 to discuss the "future of the parties' relationship."  (Id.).  Plaintiff alleges that at a staff meeting on an unspecified later date, Moody announced that AuthenTec had lost a future business opportunity with HP.

Plaintiff further asserts that "the statement concerning diversification"—presumably referring to Moody's comment in response to the analyst question regarding customers who account for more than ten percent of revenues[16]—was misleading because it "was later shown to be incorrect."  (Id. ¶ 65(e)).  Plaintiff also reiterates his previous argument that Defendants "may have" recognized revenues prematurely.  (Id. ¶ 65(f)).  Plaintiff next alleges that the "statements concerning higher ASPs in the future" were materially false and misleading because they "were incorrect" and because "AuthenTec's ASP model could not hold" due to competition from a competitor with a lower ASP.  (Id. ¶ 65(g)).  Without identifying any specific statement made by Defendants, Plaintiff finally asserts that he and other investors were misled because the "introduction of Upek's TCS5 in June 2008, *mentioned by an analyst*, was a cause for concern with respect to losing the Lenovo business" because this competitor's sensor was more durable and was FBI certified.  (Am. Compl. ¶ 65(h)) (emphasis added).  However, the Court assumes that the Plaintiff is arguing

_____

[16]Again, other than vaguely referencing a prior paragraph containing a multi-page transcript of the conference call, Plaintiff does not clearly identify which statement he finds to be materially false or misleading.  Plaintiff's failure to isolate each statement alleged to be false and explain why it is false is itself a basis to dismiss this Amended Complaint.  See In re Winn-Dixie Stores, Inc., 531 F. Supp. 2d 1334, 1346 (M.D. Fla. 2007).

that he was misled by Moody's response to the analyst's request that Moody shed light on how this new product would affect the competitive landscape, to which Moody responded that "we continue to believe that our TruePrint technology provides the best image across the greatest percentage of population out there" and "think that TruePrint really gives us a differentiated advantage." (See Am. Compl. ¶ 64; July 28, 2008 Conference Call at 17).

## II.  Pleading Standards

### A.  Motion to Dismiss

When ruling on a motion to dismiss, a court must "accept all well-pleaded facts as true, and all reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1198 n.2 (11th Cir. 2001) (citing Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1278 (11th Cir. 1999)).  Though a court is generally limited to the four corners of the complaint when considering a motion to dismiss, "in a securities fraud case, [a court] may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed." Bryant, 187 F.3d at 1278 (footnote omitted).

### B.  The Securities Exchange Act of 1934 ("the Exchange Act")

In Count I of the Amended Complaint, Plaintiff alleges that the Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  (Am. Compl. ¶ 93).  Section 10(b) makes it "unlawful for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention

of [SEC] rules and regulations." 15 U.S.C. § 78j(b). Promulgated by the SEC, Rule 10b-5

proscribes the "employ[ment of] any device, scheme, or artifice to defraud" and the "mak[ing

of] any untrue statement of a material fact or [the omission of] a material fact necessary in

order to make the statements made, in the light of the circumstances under which they were

made, not misleading." 17 C.F.R. § 240.10b-5. The Eleventh Circuit has held that in order

to successfully allege a claim for securities fraud under Section 10(b) and Rule 10b-5, "a

plaintiff must show: 1) a misstatement or omission, 2) of a material fact, 3) made with

scienter, 4) on which plaintiff relied, 5) that proximately caused his injury." Bryant, 187 F.3d

at 1281.

In Count II, Plaintiff alleges that the Individual Defendants, Moody and Larsen,

violated Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a)), which provides for joint and

several liability of "controlling persons" found liable for a securities violation. (Am. Compl.

¶¶ 104-06). In full, Section 20(a) provides:

> Every person who, directly or indirectly, controls any person liable under any
> provision of this chapter or of any rule or regulation thereunder shall also be
> liable jointly and severally with and to the same extent as such controlled
> person to any person to whom such controlled person is liable, unless the
> controlling person acted in good faith and did not directly or indirectly induce
> the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). The Eleventh Circuit has defined "controlling person" as one who "'had

the power to control the general affairs of the entity primarily liable at the time the entity

violated the securities laws . . . [and] had the requisite power to directly or indirectly control

or influence the specific corporate policy which resulted in the primary liability.'" Brown v.

Enstar Group, Inc., 84 F.3d 393, 396 (11th Cir. 1996) (quoting Brown v. Mendel, 864 F.

Supp. 1138, 1145 (M.D. Ala. 1994)).

C.  Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA")

Complaints alleging securities fraud are subject to specific rules of pleading—the requirements of Federal Rule of Civil Procedure 9(b) and of the PSLRA.  Rule 9(b) requires that a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  A plaintiff meets this requirement by setting forth in the complaint "'(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'" Ziemba, 256 F.3d at 1202 (quoting Brooks v. Blue Cross & Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997) (internal quotation omitted)).  "A sufficient level of factual support for a [Section 10(b)] claim may be found where the circumstances of the fraud are pled in detail. This means the who, what, when where, and how: the first paragraph of any newspaper story."  Garfield v. NDC Health Corp., 466 F.3d 1255, 1262 (11th Cir. 2006) (internal quotation marks omitted).

In addition to the specific pleading requirements of Rule 9(b), a plaintiff alleging securities fraud must also comply with the requirements of the PSLRA.  Enacted in 1995 to curb perceived abuses in private securities class actions, the PSLRA imposes additional pleading burdens upon plaintiffs litigating securities fraud claims in federal courts.  Instituto

De Prevision Militar v. Merrill Lynch, 546 F.3d 1340, 1344-45 (11th Cir. 2008). The PSLRA requires that a plaintiff alleging that an untrue or misleading statement has been made or omitted: (1) "'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,'" Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 321 (2007) (quoting 15 U.S.C. § 78u-4(b)(1)); and (2) "'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,'" id. (quoting 15 U.S.C. § 78u-4(b)(2)). "In any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met." 15 U.S.C. § 78u-4(b)(3).

### III. Discussion

#### A. Count I—Section 10(b) and Rule 10b-5

At the core of Plaintiff's Amended Complaint is the allegation that Defendants' statements were false or misleading due to the omission of information regarding software problems during the development of the AES2810 sensor. Plaintiff alleges that these software problems led to deteriorating customer satisfaction with AuthenTec's products, culminating in the loss of a 2009 design-in opportunity with HP and a reduction in earnings expectations for 2008. Essentially, Plaintiff argues that Defendants' failure to disclose the software problems rendered their comments regarding revenue expectations and relationships with OEMs misleading or deceptive. Defendants now move to dismiss the Amended Complaint, arguing that the statements complained of by Plaintiff were protected forward-looking statements, that the Amended Complaint does not plead facts sufficient to give rise to a strong inference of scienter, and that the Plaintiff has not adequately pleaded

loss causation.  (Doc. 75 at 6, 13, 22).

### 1.  Forward-Looking Statements

Defendants claim that all of the alleged false or misleading statements contained in the Amended Complaint constitute protected forward-looking statements.  (Id. at 7).  The PSLRA "provides a safe harbor from liability for certain 'forward-looking statements.'" Harris v. Ivax Corp., 182 F.3d 799, 803 (11th Cir. 1999) (citing 15 U.S.C. § 78u-5(c)(1)).  Under this safe harbor provision, "corporations and individual defendants may avoid liability for forward-looking statements that prove false if the statement is 'accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.'" Id. (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)).  Additionally, even should no cautionary language accompany the forward-looking statement, a plaintiff must prove that the defendant made the statement with "actual knowledge" that the statement was "false or misleading." Id.  Where meaningful cautionary language accompanies a statement, however, the court need proceed no further because the defendant's state of mind is then irrelevant.  (Id. at 804-05).

The PSLRA defines forward-looking statements to include:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;
(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;
(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;
(D) any statement of the assumptions underlying or relating to any statement

described in subparagraph (A), (B), or (C);
(E) any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer; or
(F) a statement containing a projection or estimate of such other items as may be specified by rule or regulation of the Commission.

15 U.S.C. § 78u-5(i)(1).

When assessing forward-looking statements, the Eleventh Circuit requires a "piecemeal examination of the statements found in a company communication" and instructs that these statements must be read in context. Harris, 182 F.3d at 804-05. The alleged false or misleading statements complained of by Plaintiff in the Amended Complaint, when read in context with the accompanying material, include only one statement that does not constitute a forward-looking statement. This lone statement is Moody's statement made during the October 29, 2007 conference call that "[t]he development activity around [Borah] continues to progress and now is design[ed] in by three top tier OEM accounts." This is not a statement of future economic performance or of the plans and objectives of management. Nor is this an "assumption underlying" predictions contained elsewhere in the conference call. Rather, this is a statement conveying that AuthenTec's newest sensor had already been designed-in by three top-tier OEMs as of October 29, 2007—an assertion later shown to be misleading, if not false, from a review of internal company emails. The remainder of the statements, however, qualify as forward-looking statements because they are "statements of future economic performance" and "plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." Harris, 182 F.3d at 804-05.

The next question is whether the forward-looking statements were accompanied by meaningful cautionary statements. "[W]hen an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." Id. at 807. "[B]oilerplate warnings will not suffice as meaningful cautionary statements . . . . The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." H.R. Conf. Rep. No. 104-369, at 43 (1995). Regarding the application of meaningful cautionary language to the conference calls, "Congress was explicit in stating that meaningful cautionary language could incorporate by reference information contained in documents filed with the SEC." Harris v. IVAX Corp., 998 F. Supp. 1449, 1454 n.4 (S.D. Fla. 1998), aff'd 182 F.3d 799 (11th Cir. 1999).

In their motion to dismiss, Defendants identify a cautionary statement provided at the start of the July 28, 2008 conference call. (Doc. 75 at 11). The statement reads:

> Please be advised that matters discussed in this teleconference contain forward-looking statements regarding future results or events. We caution you that such statements are, in fact, predictions that are subject to risks and uncertainties that could cause actual[] events or results to differ materially. Additional risks and uncertainties that could cause actual events or results to differ materially from these forward-looking statements may be found in the Company's filings with the Securities and Exchange Commission.

(July 28, 2008 Conference Call at 1-2). The October 29, 2007 conference call, the February 4, 2008 conference call, and the April 28, 2008 conference call all contained similar cautionary statements. (See Oct. 29, 2007 Conference Call at 2; Feb. 4, 2008 Conference Call at 2; Apr. 28, 2008 Conference Call at 3-4).

The October 29, 2007 Press Release also provided a cautionary statement. It cautioned:

> This quarterly financial results press release contains statements relating to expected future results and business trends that are based upon AuthenTec's current estimate, expectations, and projections about the industry, and upon management's beliefs, and certain assumptions it has made that are "forward-looking statements" as defined in the Private Securities Litigation Reform Act of 1995. . . . Such statements are not guarantees of future performance and are subject to certain risks, uncertainties, and assumptions that are difficult to predict. Therefore, the Company's actual results may differ materially and adversely from those expressed in any "forward-looking statement" as a result of various factors. These factors include, but are not limited to: demand for, and market acceptance of, new and existing fingerprint sensors in the PC and wireless markets, the Company's ability to secure design wins for enterprise and consumer laptops and wireless devices, the adoption of AuthenTec's sensors in desktops and PC peripherals, . . . additional opportunities in various markets for applications that might use AuthenTec's products, and changes in product mix, as well as other risks detailed from time to time in its SEC filings, including those described in AuthenTec's quarterly report on Form 10-Q filed with the Securities and Exchange Commission on August 8, 2007 and its registration statement.

(Oct. 29, 2007 Press Release at 3-4). The February 4, 2008 press release, the April 28, 2008 press release, and the July 28, 2008 press release all contained similar cautionary statements. (See Feb. 4, 2008 Press Release at 3-4; Apr. 28, 2008 Press Release at 4; July 28, 2008 Press Release at 4).

In addition to the cautionary statements contained in the conference calls and press releases, AuthenTec also included a number of warnings in its quarterly reports filed with the SEC. In the Form 10-Q filed for the quarterly period ending September 28, 2007, AuthenTec identified a number of risks that could impact the company. (See Third Quarter 2007 10-Q, Ex. 2 to Doc. 52). In a section entitled "Cautionary Note Regarding Forward-Looking Statements," AuthenTec stated:

[O]ur actual results may differ materially and adversely from those expressed in any "forward-looking statements" as a result of various factors.  These factors include, but are not limited to: industry and global economic and market conditions, such as the cyclical nature of the semiconductor industry and the markets addressed by our customers' products; demand for, and market acceptance of, new and existing products; successful development of new products; . . . new product performance and quality; . . . pricing pressures and other competitive factors, such as a competitor's new products; . . . customer service; the extent that customers use our products in their business, such as the timing of subsequent entry of our customer[s'] products containing our components into production, the size and timing of orders from customers, and customer cancellations or shipment delays.

(Id. at 15).

AuthenTec also provided a number of specific warnings.  For example, AuthenTec explicitly warned that its quarterly operating results would be subject to fluctuation as a result of various factors, including "our ability to . . . retain existing customers" and the "unpredictability of the timing and size of customer orders." (Id. at 43).  AuthenTec then stated that because of these factors, among others, "it is difficult for us to accurately forecast our growth and results of operations on a quarterly basis.  If we fail to meet expectations of investors or analysts, our stock price may fall rapidly and without notice." (Id.).  AuthenTec also warned that its products "are often subject to rapid declines in average selling prices" and that it "may be required to reduce . . . prices more aggressively than planned," causing financial results to suffer if the company was unable to offset this price reduction in some manner.  (Id. at 19).  Additionally, the company stated that its research and development expenses "primarily include personnel, . . . engineering development software, [and] . . . *thrid-party development support.*" (Id. at 17) (emphasis added).

Regarding customer satisfaction with AuthenTec's products, the quarterly report

stated:

> Our customers generally establish demanding specifications for quality, performance[,] and reliability that our products must meet. However, our products are highly complex and may contain defects and failures when they are first introduced or as new versions are released. . . . If defects and failures occur in our products, we could experience lost revenue, increased costs, . . . . delays in or cancellations or rescheduling of orders or shipments, . . . . In addition, delays in our ability to fill product orders as a result of quality control issues may negatively impact our relationship with our customers.

(Id. at 47). AuthenTec cautioned that its financial performance "will depend on our ability to meet customer specifications and requirements by enhancing our current fingerprint authentication solutions and developing new products with new and better functionality." (Id. at 23). The company then warned that if it was "unable to enhance the functionality of our solutions or introduce new solutions which achieve widespread market acceptance, our reputation will be damaged, the value of our brand will diminish, and our business will suffer." (Id.).

The cautionary statements in the press releases, the conference calls, and related SEC filings warned "of risks of a significance similar to that actually realized." See Harris, 182 F.3d at 807. The Court finds that these forward-looking statements were accompanied by meaningful cautionary statements. Accordingly, Defendants' state of mind is irrelevant, and no Defendant can be found liable for these forward-looking statements.

In addition to the findings set forth above, the Court also finds that the Amended Complaint does not state with particularity facts sufficient to create a strong inference of the Defendants' "severe recklessness" necessary to satisfy the pleading requirement of scienter in connection with Moody's October 29, 2007 statement or any of the forward-looking

statements.

2.  Causation

The Court now proceeds to examine whether Plaintiff has adequately pleaded loss causation in connection with Moody's statement that "[t]he development activity around [Borah] continues to progress and now is design[ed] in by three top tier OEM accounts."

The PSLRA "expressly imposes on plaintiffs 'the burden of proving' that the defendant's misrepresentations 'caused the loss for which the plaintiff seeks to recover.'" Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 345-46 (2005) (quoting 15 U.S.C. § 78u-4(b)(4)). "Loss causation 'is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" Lentell v. Merrill Lynch & Co., 396 F. 3d 161, 172 (2d Cir. 2005) (quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 343 F.3d 189, 197 (2d Cir. 2005)).  An "artificially inflated purchase price" is not in and of itself a relevant economic harm.  Dura Pharms., 544 U.S. at 347.  In addition to alleging an artificially inflated purchase price, a plaintiff must also allege a causal connection between the false or misleading statement and the subsequent decline in share price.  Id.  "'A plaintiff must allege that the subject of the fraudulent statement or omission was the cause of the actual loss suffered, i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'" Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc., 595 F. Supp. 2d 1253, 1278-79 (M.D. Fla. 2009) (quoting Lentell, 396 F.3d at 173).

Plaintiff's Amended Complaint does not adequately plead causation because the Plaintiff does not allege a sufficient causal connection between Moody's misleading

statement and the decline in share price approximately ten months later.  Moody's October 29, 2007 statement was misleading because he claimed that the AES2810 had been "designed in" by three OEMs when it appears that at least one of these OEMs had not finalized its decision to use the AES2810 sensor in its product at the time Moody announced that fact.  However, the Amended Complaint states that AuthenTec "locked in" this third OEM, Lenovo, in early December 2007.  (Am. Compl. ¶ 43(a)).  Plaintiff cannot establish that the disclosure of this premature announcement of achieving design ins with three OEMs negatively affected the value of AuthenTec's stock because AuthenTec did in fact achieve these design ins prior to Moody's statement being discovered to be inaccurate.  Simply put, though Moody's statement was misleading and perhaps false when made, subsequent events prior to its disclosure cured any harm that this misstatement could have caused.

The Court finds that Plaintiff has not adequately pleaded loss causation, and therefore Count I of the Amended Complaint fails to state a claim for which relief can be granted.

B.  Count II—Section 20(a)

In Count II, Plaintiff contends that Moody and Larsen violated Section 20(a) of the Exchange Act.  (Am. Compl. ¶ 104).  However, because this Court has concluded that Plaintiff's Second Amended Complaint fails to state a claim against Defendants under Section 10(b) and Rule 10b-5, Plaintiff's dependent Section 20(a) claim must also fail.  See Rosenberg v. Gould, 554 F.3d 962, 966-67 (11th Cir. 2009).

IV.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1.  Defendants' Motion to Dismiss (Doc. 75) is **GRANTED.**

2.  Plaintiff's Amended Complaint is **DISMISSED WITH PREJUDICE**.

3.  The Clerk is directed to close this file.

**DONE** and **ORDERED** in Chambers, Orlando, Florida this 24th day of September,

2009.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party